## The M. K. & T. Railroad Co. v. Wm. Weaver.

1. Excessive Damages; *New Trial; Prejudice of Jury.* The mere fact that damages are excessive, is not a ground for new trial. They must appear to have been given under the influence of passion, or prejudice.

2. ———— *Injuries Sustained.* Where a passenger is wrongfully expelled from the cars, and it appears that while there was a sharp scuffle, some blows given, and some blood drawn, there were no broken limbs or bones, no permanent injury or disfiguration, no long confinement, no protracted pain and suffering, no heavy expenses for medicine, nursing, or physician, little loss of time, not to exceed a day's delay, and no circumstances of outrage and insult independent of the actual expulsion, *held,* that a verdict awarding $5,000 damages was excessive.

3. General Verdicts—*Sustained by Evidence; Particular Questions of Fact.* Where a general verdict is returned for plaintiff, which is correct if either one of three several facts exist, and special questions are submitted to the jury as to existence of these facts, and all answered in the affirmative, the verdict will not be set aside as against the evidence if one of these answers is supported by the testimony, although the second answer is clearly and the third probably against the evidence.

4. ———— But the fact that these questions are thus answered, tends to show passion or prejudice on the part of the jury, and in this case does, with the amount of the verdict, show such a wrong as calls for the interference of the court, and a reversal of the judgment.

*Error from Neosho District Court.*

Action by *Weaver*, brought in October 1871, to recover damages sustained by reason of his being put off the cars of the *Railway Company*, near New Chicago, on the 15th of July 1871. The action was tried at the December Term 1873 of the district court. Verdict and judgment for plaintiff for $5,000, and costs—and the *Railway Company* brings the case here on error.

*T. C. Sears*, for plaintiff in error.

*Stillwell & Baylies*, for defendant in error.

The opinion of the court was delivered by

BREWER, J.: This was an action brought by Weaver to recover damages for a forcible expulsion by the company from one of its coaches. Verdict and judgment were in favor of Weaver for $5,000. Special questions of fact were submitted to the jury, and answered as follows:

1st.–Was the plaintiff informed by the agent of the defendant at New Chicago, that the paper in his possession, and upon which he demanded a ride in defendant's cars to Chetopa, was not a good ticket, and would not entitle him to a passage on defendant's cars? *Answer*, No.

2d.–Was the conductor of defendant's train, upon which the plaintiff entered, instructed by the defendant to eject from the cars any person who refused to produce a ticket or pass, duly signed, or to pay the money for his passage? *Answer*, Yes.

3d.–Did the plaintiff tender to the conductor of the defendant's cars a ticket entitling him to be carried from New Chicago to Chetopa, or any other point on defendant's road? *Answer*, Yes.

4th.–If the jury answer the last question in the affirmative, please describe the ticket. *Answer*, From Kansas City to Chetopa.

5th.–Did the plaintiff offer to pay his fare at any time before the stoppage of the train and the commencement of his expulsion, or did he offer a pass duly signed by any authorized officer of the company? *Answer*, Yes.

6th.–Did the conductor of the defendant's train inform the plaintiff that, in the absence of a ticket, he must pay for his passage in defendant's cars? *Answer*, Yes.

7th.–Did the conductor of the defendant's train inform the plaintiff that unless he so paid he should be compelled to stop the train and expel him from the cars? *Answer*, Yes.

8th.–After he so informed him, did plaintiff refuse to produce a ticket or pay for his passage before the train was stopped, and his expulsion attempted? *Answer*, No.

9th.–Did the servants and agents of the defendant use more force in the expulsion of the plaintiff from the cars of the defendant than was necessary to eject him and overcome his resistance? *Answer*, Yes.

10th.–Was any unusual or unnecessary violence or force

30 —16 KAS.

employed by the defendant's servants and agents, before the plaintiff was put upon the ground? *Answer*, Yes.

11th.–After the plaintiff had been ejected and put on the ground, who was the aggressor in the conflict that afterward ensued, if there was any conflict? *Answer*, Defendant.

A motion was made to set aside the verdict on the ground that it was against the evidence, and that the damages were excessive. This motion was overruled, and this presents the principal question for our consideration.

Are the damages excessive? We are constrained to think they are greatly excessive. We quote so much of the plaintiff's testimony as bears upon this matter. He testified as follows, on his examination in chief:

"Mr. Hall was the conductor. He passed on some distance in the cars, and came back to me, and he asked me something in regard to my ticket, where I purchased it, and said I had the wrong coupon. He stated I'd have to pay my fare to Chetopa. I remarked that I did not feel willing to pay it a second time; that I paid it once. We discussed the matter in friendly tone and quiet, in the beginning of it. I told him that if a mistake was made, it was their mistake, and not mine. Hall said he should put himself to no trouble to correct the mistake of the other road. I said I did not intend to deprive them of anything; that as soon as we arrived at a station they could telegraph to know if I had bought a ticket. I told him I would deposit a hundred dollars with him or any other responsible man in the car, for the purpose of indemnifying the company that I was not wronging them out of their rights. He then stated I should pay, or he would put me off the train; and I refused to pay under the circumstances. He stopped the train, and there was two or three men came to his assistance. I did not think they were going to do it, and I held on to the seat some time, and they finally pulled me loose and took me toward the door. I offered to pay, and Hall said, 'Pay hell,' and shoved me out. There were three, and perhaps four, had hold of me. There was nothing unusually abusive until I was out of doors. I don't remember anything that occurred after I reached the steps. I had used a great deal of exertion in trying to keep in. The last I remember we were all tugging on the platform — some had hold of me in front, and some behind. The blood rushed to my head so that I was as blind as a bat. I remember

nothing after that. I was sitting on the ground when I came to myself. My face was bloody, and my mouth was bleeding. My mouth was cut, and there were two other wounds on my head. About the time I got up, some one threw my hat out of the window. The cars were just moving off. I walked about forty rods, to what I took to be a railroad station-house. There I washed, and lay down, and rested a while. The section hands I hired to take me to New Chicago on the hand-car.

"*Q.*–What was the condition of your health at the time you were ejected from the cars?

"*A.*–It was poor; I had been in poor health for four years, and had been to the mountains to see if I could improve it. This trip was on my return from the mountains."

*On cross-examination he testified:* "Hall insisted on having the money. Don't think he said anything about instructions. I refused to pay, and he put me off. I was very near the center of the car. I struggled and held on to the seats as long as I could. I was very near the steps when my recollection ceased. Don't remember when striking the ground of hitting any one a severe blow. At the time my consciousness ceased, there had been no blows struck at all. I don't recollect of striking Alexander a severe blow and cutting his cheek open."

Wm. A. Nichols, who saw the plaintiff after his expulsion, and the same day, testified:

"Plaintiff's appearance at the time was that of a man who had had a fight. I think there was a cut about Mr. Weaver's mouth. His clothes were bloody. I think it was his shirt the blood was on. I saw no other wounds but those he complained of.

"*Q.*–You may state whether at the time he complained of physical suffering or wounds? [Objected to by defendant, as incompetent, as calling for declarations of party. Objection overruled, and excepted to by defendant.]

"*A.*–He complained about his head. He said he was suffering from the rush of blood to his head."

Joseph A. Wells, also a witness for the plaintiff, testified:

"About this time the train came to a standstill, and Hall said he had no time to talk now—that he must get off the train. They then started to eject him from the train, and he held on to a seat on the left side. Then he was dragged to a seat on the right side of the car, and he then clutched a seat

on the other side of the car before he reached the door. About the time they reached the door, Weaver remarked to the conductor, not to put him off on the open prairie—remarked he would pay his fare to the next station, rather than be put off there. The proposal not being accepted, he was taken to the door onto the platform, and to the steps leading to the right side of the coach, his face fronting to the coach, with one hand holding to the platform, and one to the car railing, when one of the parties jumped down on the ground from the car and took hold of Weaver in the rear, and by the efforts of the three they put him on the ground. My impression is, that he struck the ground with his feet and staggered backward, and recovered, coming to nearly an upright attitude. After they were off the car, Weaver made a kind of old-woman's lick, sorter round like. I thought he was trying to strike the brakeman. The brakeman came at him, and struck him three or four times. Weaver got up afterward, and staggered off to the side of the ditch and sat down. I then went in the car and took Weaver's hat and the ticket, and threw off the hat and ticket. I was present when it was done. I saw the parties that removed Weaver from the cars after they came back, and were washing up. The smallest one of the three got his face cut with the glass of the door. I believe now that Hall got cut with the glass, and that the smallest one of the three got a cut under the left eye. I could not say positively that Weaver hit him or not."

This was all of the testimony given by the plaintiff which in any way bears upon the question of the injuries sustained. The expulsion was participated in by three parties—Hall, the conductor, and two other employés, Alexander, and Holcomb. All were retained in the employ of the company thereafter, and one, Holcomb, was shortly promoted. They were all witnesses on the trial. We quote the testimony of Alexander—the others being far more favorable to the company, and being less full and detailed than his. Alexander says:

"The first I noticed was when the train stopped, and I went back to see. When I went back into the coach, Hall and Holcomb, the brakeman, were trying to get Weaver out of the train. Hall ordered me to assist in expelling him. We took hold of him and started to get him toward the door, when he got down into another seat. Next move we got him

on the platform, and he got hold of the railing of the car. I then jumped down on the ground, and got hold of him by the right arm and pulled him down on the ground. I turned round partly, to get on the train, and Weaver invited Hall to get down and fight him. Hall didn't accept the invitation, and he turned round to me, and said, *You son of a bitch, I'll give you one*—and turned round to strike, and struck round this way, (witness motions,) and hit me here. Weaver had something in his hand that cut me. Then I struck him. The blow from Weaver didn't knock me down. No force was used except what was necessary."

*On cross-examination, witness said:* "I did not know of any difficulty. My going back into the car was simply caused by the train stopping. When I went in, Weaver was in a seat. They were trying to get him out. I believe Hall had hold behind him, and Holcomb was in front. They got him started before I took hold of him. When about three seats from the door, Weaver got into another seat. Holcomb said, *You may as well get off first as last.* We got him into the aisle, and to the door. When outside of the door Weaver got hold of the railing of the car. When I got down on the ground and took hold of his right arm, Holcomb and Hall were on the platform of the car, when Weaver invited Hall to fight. The blow he gave me was not so heavy, but it cut my face. Next I struck him, and knocked him down. I attempted to strike him again; he put his hands over his face. I got on him; I was trying to take his arms away so that I could strike him. There was so much blood flowing from my face that I could not see whether any come from plaintiff or not. I did not see any blood coming from his nose or mouth. Weaver did not say, 'enough.' Hall called me, and I got on the train. Did not hear Weaver say that he would pay when on the ground, if they would let him ride."

Now, what may fairly be deduced from this testimony? That there was a sharp scuffle in which three men overpowered one, and ejected him from the cars; that some blows were given; some blood drawn, but no broken limbs or bones, no permanent injury or disfiguration. There was no aggravated insult and abuse; no circumstances of gross outrage independent of the forcible expulsion. There was little loss of time, as the expulsion was within three miles of the place

where Weaver entered the cars, and he was taken back there the same day. There was no long confinement, no protracted pain and suffering, no heavy expenses for medicine, nursing, or physician. In short, if an individual had committed the assault and battery, a few hundred dollars would have been deemed ample compensation for the injury. We know that this is not a parallel case — that there is a special duty on the carrier to protect his passengers, not only "against the violence and insults of strangers, and co-passengers, but *a fortiori*, against the violence and insults of its own servants," and that for a breach of that duty he ought to be compelled to make the amplest reparation. The law wisely and justly holds him to a strict and rigorous accountability. We would not relax in the slightest degree this strict accountability. We know that upon it, in no small degree, depends the safety and comfort of passengers. The carrier selects his own agents, and unless he finds that violence and abuse on the part of such agents toward his passengers meets with swift and severe punishment, he will soon become indifferent to the character and conduct of such agent, and rudeness, insult and violence will take the place of politeness, courtesy, and assistance. Any one who travels sees so much of rudeness and inattention on the part of employés, is subjected to so many annoyances, petty and large, and not seldom is witness to so much actual outrage and abuse, that we would be exceedingly loth to have any relaxation of the rule which holds carriers to the most rigorous accountability for violence and wrong to their passengers. We know that in the case of *Goddard v. G. T. Railway Co.*, 57 Maine, 202, where the supreme court of Maine discussed the obligations and liabilities of railroad companies in an opinion of great ability, and with an exhaustive examination of authorities, (and with the general conclusions of which we heartily agree,) a verdict for $4,850 was sustained where there was no actual battery, but only a gross, outrageous, and protracted assault. But the circumstances of that outrage were so wanton, so vilely abusive, as perhaps to justify the verdict.

Here, the expulsion may have been wrongful, but it does not seem to have been wanton, or excessively cruel. We are constrained therefore to believe that this verdict was excessive, and that the jury, in their anxiety to punish the company for its wrong, have failed to administer equal and impartial justice between it and its passengers.

Was the verdict, or were any of the answers to the special questions, against the evidence? Counsel contends earnestly that some of them were. He challenges, in the first place, the third and fourth answers, and contends that it is clear that Weaver had no ticket when he entered the company's train at New Chicago. Upon this point we think the counsel is mistaken, and that there was testimony sufficient to support these answers. Weaver testifies that he purchased a ticket at Kansas City for Chetopa, and paid between eight and nine dollars for it, and gives the day upon which he purchased. There is no contradictory testimony upon this. It was evidently a coupon ticket, for he says that soon after leaving Kansas City a conductor came along and tore off a portion, and afterward another conductor tore off another portion. Upon cross-examination he says that there were two coupons and a stub to the ticket. When he reached New Chicago he unquestionably had some portion of the paper given him as his ticket at Kansas City. Here he entered the cars of the defendant. Before entering, he presented this paper to the baggage-master, who upon the faith of it checked his baggage to Chetopa. The baggage-master, who was also ticket agent, testified to a conversation with Weaver concerning this paper, which Weaver denies. The conductor took up this paper, punched it, and passed along through the car. He shortly returned, and told Weaver that he had the wrong coupon. There was some talk about a mistake having been made by the conductor on the other road, (the L. L. & G. railroad,) and Hall said he should put himself to no trouble to correct the mistake of that road. Nichols testifies to seeing this paper, that on it was printed, "Kansas City to Chetopa," and also in one corner, in small letters, "Chetopa," and that it

was punched. The conductor testifies that Weaver handed him "a portion of a coupon reading from Kansas City to Tioga;" that he said to him that it was not good; may have said that it belonged to L. L. & G. road, and did tell him that he could hold the ticket, and that it was as good as a bank note. He says that "punching" generally destroys a ticket, and that he does not recollect whether he punched this ticket or not. The paper itself was lost before the trial. There seems no reason to doubt the good faith and honesty of Weaver. He offered to deposit $100 with the conductor, to be forfeited if his statement as to the purchase of the ticket was not correct. And it is clear that he bought a ticket to Chetopa, and that he had in his possession all that had not been taken off by prior conductors. This remnant was good enough to secure the checking of his baggage, and was taken by the conductor at first as good for his ride. Further than that, the testimony is conflicting. It seems quite probable that the conductors on the L. L. & G. road had removed all the coupons, and left nothing but the stub; but still this is not clear, certainly not so clear as to entirely do away with the presumption arising from the purchase and use of the ticket. We think therefore, the answers of the jury to these questions cannot be held to be against the evidence and wholly unsupported by it.

The answer to the fifth question is challenged, and it is claimed that there was no testimony tending to show a "pass," or that Weaver offered to pay the fare before the stoppage of the train and the commencement of his expulsion. Here we think counsel is correct. There was no pretense that Weaver had a "pass," and the testimony of Weaver and Wells (his witness) heretofore quoted, plainly shows that Weaver's offer to pay was not till after the stoppage of the train and the employés had commenced to eject him. We fail to find any testimony which tends to show any offer to pay before the stoppage of the train and the commencement of the expulsion.

The answer to the ninth question is also challenged, and it

is contended that it is clear that no unnecessary violence was offered. We think the testimony discloses about this, that no unnecessary force was used in actually removing plaintiff from the cars, but that after he was landed on the ground there.was unnecessary violence done to him. Whether this needless violence was so disconnected from the expulsion as to be wholly a volunteer assault by the brakeman, or a part of the force used to complete the expulsion, by preventing Weaver from getting onto the train, is not clear, though we are inclined to consider it a mere volunteer assault. If a volunteer assault, the answer was not supported by the evidence; if not, it was.

A general verdict was returned. This verdict can be sustained upon either one of three facts, that Weaver tendered a ticket entitling him to a ride, or that before the stoppage of the train he offered to pay his fare, or that unnecessary violence was used in ejecting him. In our review of these facts, it will be seen that we have concluded that the findings of the jury can be sustained as to the first fact, that it is clearly against the testimony as to the second, and probably so as to the third. The first fact however sustains the verdict as against a motion to set it aside on the ground that it is against the evidence. What then should be the disposition of the case in this court? We have found that the damages were excessive, that to each of the three principal questions asked of the jury they answered yes—one of which was clearly not warranted by the testimony, one probably not, and the third only barely supported by the evidence. The mere fact that damages are excessive, and above that amount which the court thinks would be just, is not of itself sufficient ground for a new trial. The statute says, "excessive damages, appearing to have been given under the influence of passion or prejudice." (Gen. Stat. p. 687, Code, § 306.) But often the amount of the verdict may be so excessive as of itself to indicate passion or prejudice. It may be so wholly disproportioned to the wrong done, and injury sustained, as to be susceptible of no other explanation than that the jury were carried away by an im-

proper eagerness to punish. We are not prepared to say in this case that the mere size of the verdict carries a conviction of that, considering the special duty of care and protection due from the company to the passenger. It would, if the assault were free from that special consideration, and regard were to be had simply to the extent of the injuries received by Weaver. But here, in addition, the state of mind of the jury is disclosed by the answers they returned. Everything was decided against the company, and in favor of Weaver, and decided too in some instances in plain disregard of the testimony. Not content with resolving every doubt in his favor, they answer every question in the same way, and without regard to the facts. This shows that they were not so impartial, so free from passion or prejudice, as to be fit triers of this controversy. It shows that they failed to give due consideration to those matters making in favor of the company; and if they did as to the facts of the case, it tends strongly to show that they did also as to the damages sustained. We are constrained therefore to order a reversal of the judgment, and remand the case for a new trial.

All the Justices concurring.