THE ATCHISON, TOPEKA & SANTA FÉ RAILROAD COMPANY v. A. C. GANTS.

1. REGULATION—*Stopping Only at Certain Stations.* A railroad company may adopt a regulation that one of its through, or fast trains, running regularly on its road, shall stop only at certain designated stations or places.

2. GOING AND STOPPING—*Passenger to Know.* It is the duty of a person about to take passage on a railroad train, to inform himself when, where and how he can go, or stop, according to the regulations of the railroad company.

3. PASSENGER, *Trespasser on Train, When.* Where a person purchases a railroad ticket for a designated station upon a railroad, without making any inquiries, or ascertaining what train stops at the station to which he desires to go; and subsequently takes his seat upon a car of a train which, according to the regulations of the company, does not stop at the station for which he has the ticket; and such person refuses to pay his fare, on demand of the conductor, to the next station at which the train is to stop; and also refuses to leave the train when requested so to do by the conductor, after he has stopped the train at a suitable place for that purpose, such person is a trespasser upon the train.

4. TRESPASSER, *Ejected from Train, When.* A trespasser may be ejected from a train, after it has stopped, at a place other than a depot or

when caught in but the sta
... the town th...
... that ...
came ... upon when
a refused to go ... is
the first step ... i a
could ... for ... expected.

station, provided care is taken not to expose his person to serious injury or danger; but in such an ejection, the railroad company is not required to have consideration for the mere convenience of the wrongdoer.

5. EJECTION; *Force, How to be Used; Liability.* The conductor and trainmen of a railroad train have the right to eject a trespasser from the train at any suitable place, but in doing so they should not use unnecessary force, or excessive violence; if, however, such a person forcibly resists ejection, he cannot recover for the force used in overcoming his resistance, where such force is without intention on the part of the conductor, or trainmen, to commit unnecessary injury. In such a case, the railroad company is only liable for such unnecessary force, or excessive violence, as is willful, wanton, or malicious.

6. ———— *Pay Fare, or Get Off.* Where a person makes a mistake in taking a seat upon a train which does not stop at the place he desires to go, and fare is demanded of him upon the train by the conductor to the first station at which the train is to stop, and he is able to pay the same; but refuses so to do, and then the conductor stops the train and requests him to leave or pay, he should either pay his fare or get off. If his mistake was induced by the ticket agent of the company, then the extra fare which he pays is an element of damages, in addition to such as are occasioned by his being carried beyond his destination.

7. PASSENGER *Not to Invite Force to Increase Damages.* A person upon a railroad train cannot insist that the conductor shall permit him to ride without a proper ticket for that train, in violation of the regulations of the company. No one has a right to resort to force to compel the performance of the contract; and therefore where a person upon a train by mistake of the local ticket agent, has a ticket to a station that the train does not stop at, he must either pay the extra fare demanded, or get off when ordered so to do; and cannot invite force in his ejection or removal, merely to make a case against the company, or to increase his damages.

8. PROFANE LANGUAGE — *Incompetent Evidence.* Where a plaintiff was ejected from a railroad train, and evidence was offered tending to show that before his ejection he used vile, obscene, and profane language in a car filled with passengers, including many women and children; and upon his part he introduced two witnesses, one of whom testified "that he never heard him use half a dozen oaths in his life," and the other that "he never heard him use obscene language in public, but might have heard him make use of an oath sometime, but not frequently," *held,* such latter evidence is incompetent.

9. CONDUCTOR *Represents Company as to His Own Route.* A conductor upon a branch road, or connecting road of the same railroad company, in collecting fares, taking up tickets and giving information

39 — 38 KAS.

to the passengers on his own train, represents the company as to his own route, but does not represent the company in giving information as to the running and operation of the trains upon the main line, with which he has no employment.

10. EJECTION — *Wanton and Malicious Force Used — Liability.*   Where a person is removed from a railroad train with the assistance of some of the passengers, and willful, wanton and malicious force is used in the ejection by the passengers assisting, the railroad company may be liable therefor, although no express directions were given by the conductor or trainmen to the passengers, as their employment to assist may be inferred; otherwise, however, if the passengers are mere interlopers and the conductor and trainmen have no opportunity to interfere with their actions.

### *Error from Harvey District Court.*

On May 29, 1885, *A. C. Gants* brought his action against *The Atchison, Topeka & Santa Fé Railroad Company,* and in his petition alleged:

"That at all times hereinafter mentioned, the defendant was and now is a corporation duly organized under and pursuant to the laws of the state of Kansas, and was the owner of a certain railroad known as the Atchison, Topeka & Santa Fé Railroad, with the tracks, cars, and other appurtenances thereunto belonging, and was a common carrier for hire and reward from the city of Newton, in Harvey county, to the city of Peabody, in Marion county, being wholly within the state of Kansas; that on the 19th day of May, 1885, the defendant, in consideration of the sum of fifty cents then paid to it by the plaintiff therefor, at its ticket office in the city of Newton, issued to him a ticket entitling him to a first-class passage, and to be carried from said city of Newton to said city of Peabody, a nd thereby undertook and agreed as such common carrier, to transfer and carry the plaintiff from said city of Newton to said city of Peabody as a passenger, and plaintiff thereupon entered one of the cars of the defendant, to be conveyed from said city of Newton to the city of Peabody aforesaid; that while he was such passenger at said county of Harvey, and when at a distance of about three miles from the said city of Newton, on said line of railroad, and on the day aforesaid, the defendant, by the conductor and trainmen on said train, set upon the plaintiff, and with unnecessary violence assaulted, beat, bruised, cut, maimed, wounded and lacerated the plaintiff in the most grievous manner; took from him said ticket,

seized and despoiled him of a large amount of money, to wit, the sum of one hundred dollars, and then and there afterward threw and ejected him forcibly and violently from one of its cars upon a heap of stones, cutting, lacerating and bruising him, thereby causing lasting and permanent injury to him, the said plaintiff; that ever since that time he has suffered from internal injuries, received therefrom as aforesaid, so that he cannot retain food in his stomach, but immediately after eating is attacked with violent vomitings and retchings, causing him great pain and suffering; that since that time he has been unable to pass urine or fecal matter without the use of artificial means, and then only with great pain; that he has suffered great pain along the region of his spinal column, and was by the said acts of the defendant permanently and seriously injured in his spine; that plaintiff on account of said injuries has suffered and languished from hence hitherto; that the plaintiff was then in good health, and was then earning and continuously able to earn, prior to the injuries complained of, seventy-five dollars per month; that he was thereby disabled from attending to his business for the space of ten days thereafter, being wholly or almost deprived of the use of his limbs, and has been compelled to pay one hundred and fifty dollars for medical attendance; that on acccount of said injuries so received, plaintiff has suffered great mental and bodily anguish, to his damage of fifty thousand dollars.

"Wherefore, the plaintiff prays judgment against said defendant for fifty thousand dollars, his damages sustained by reason of the premises so as aforesaid alleged, and all other proper relief."

On June 29, 1885, the railroad company filed the following answer:

"1. Now comes the defendant in the above-entitled cause, and for answer to plaintiff's petition filed therein, denies each and every material allegation therein contained.

"2. The defendant, further answering, for a full and complete defense states: On the occasion complained of in the petition, the plaintiff attempted to ride on the fast passenger train of defendant, bound eastward, which train, according to the rules and regulations of the defendant, which were well known to the plaintiff and the traveling public, generally did not stop at Peabody, and that the conductor of said train put the said plaintiff off of the said train, using no unnecessary force, because the plaintiff refused, after demand, to pay fare to the

station beyond Peabody, namely, Florence, at which said train would stop; and further, because said plaintiff, when the conductor informed him that the train would not stop at Peabody, insisted upon riding upon said train, and used violent, profane and offensive language, and behaved in such an indecent manner as to authorize and justify the defendant's conductor in ejecting him from the train. Wherefore, defendant prays judgment."

On July 1, 1885, Gants filed a reply containing a general denial of the matters and things alleged in the second defense of the answer. Trial had at the February term, 1886, before the court with a jury. The jury returned a verdict for the plaintiff, and assessed his damages at four thousand dollars; and also made the following special findings of fact:

"1. Is it not a fact that the train upon which the plaintiff attempted to take passage from Newton to Peabody, Kansas, was a train which, under the rules and regulations of the defendant, in force at that time, did not stop at Peabody, Kansas, unless it had passengers upon it from west of Newton? *Ans.:* Yes."

"5. Prior to the time the train started upon which plaintiff attempted to take passage from Newton to Peabody, Kansas, did not plaintiff know or was he not informed that such train would not stop until it arrived at Florence, Kansas? A. No.

"6. Is it not a fact that when the conductor came up to the plaintiff on the train on which plaintiff was attempting to take passage from Newton, Kansas, to Peabody, Kansas, to demand plaintiff's fare, that plaintiff handed to such conductor his ticket, and that such conductor then and there informed him that the train did not stop at Peabody, Kansas, but that its first stop would be at Florence, and that he, the conductor, would accept such ticket for the amount paid for it on the plaintiff's paying to him the fare from Peabody to Florence, and that he would carry the plaintiff to Florence? A. Yes.

"7. Is it not a fact that the plaintiff refused to pay to the conductor of the train on which he was attempting to take passage, from Newton to Peabody, Kansas, the amount of fare from Peabody to Florence, the point at which said train first stopped, under the rules and regulations of the defendant after he was informed that such train would not stop at Peabody, and that its first stop would be at Florence? A. Yes.

"8. Is it not a fact that the conductor, in the last question referred to, informed the plaintiff that if he would not pay in addition to his ticket the fare from Peabody to Florence, that he, the conductor, would have to stop the train and put him (the plaintiff) off ?   A. Yes.

"9. Is it not a fact that the conductor of the train upon which the plaintiff was attempting to take passage from Newton to Peabody, stopped such train for the purpose of putting plaintiff off after his refusing to pay his fare from Newton to Florence ?   A. Yes.

"10. Is it not a fact that at the time of stopping such train for such purpose as is referred to in the last question, the conductor of such train was actuated by a desire to obey the rules of the company by whom he was employed ?   A. Yes.

"11. Up to the time the train was stopped for the purpose of putting off plaintiff, had the conductor of such train demeaned himself in any way different from that of a gentleman towards the plaintiff ?   A. No.

"12. Prior to the time that plaintiff was actually put off from the train, did plaintiff offer to pay his fare to the first station at which the train he was upon stopped, under the rules and regulations of the defendant ?   A. No.

"13. Is it not a fact that after the train was stopped, the conductor of such train requested the plaintiff in a gentlemanly manner to leave the train ?   A. Yes."

"15. State if it is not a fact that the plaintiff resisted being put off from the train after it had come to a full stop, to the utmost of his power and ability ?   A. Yes.

"16. How many people were actually engaged in getting plaintiff from the place where he was seated in the car, after the train stopped, to the platform of such car, for the purpose of putting him off ?   A. Three.

"17. Under the resistance offered by the plaintiff to being put off from the train, how much less force would it have taken to have put him off than was used ?   State fully.   A. One-half less, or two men should have taken him out of the car.

"18. Was it not a fact that after the train was stopped for the purpose of putting plaintiff off from it, and before any hands were laid upon the plaintiff to put him off from such train, that plaintiff refused to go off, and dared the conductor to put him off ?   A. Yes.

"19. Is it not a fact that the car in which the plaintiff was

seated at the time he was put off from the train, was pretty well filled with passengers, including many ladies? A. Yes."

" 21. State fully what acts or force or violence were used by the conductor or any person in putting plaintiff off from that train, in excess of that force which was required and made necessary to be used by the resistance of the plaintiff. A. The force that produced the wounds on hands, back and limbs."

" 23. Could the conductor on that train, under the resistance offered by the plaintiff, remove plaintiff from it without assistance? A. No.

" 24. Could the trainmen of that train have removed plaintiff, under the resistance which he offered, without the use of a great deal of force? A. Yes.

" 25. State for what purpose the plaintiff offered the resistance which he did offer to being removed from that train. A. Because he thought he had a right to be on that train."

" 27. If the jury find for the plaintiff, they may state how much they allowed plaintiff for moneys expended by him for medicine. A. Ten dollars.

" 28. If the jury find for the plaintiff, they may state what they allowed plaintiff for expenses incurred for medical attendance. A. Twenty-seven dollars.

" 29. If the jury find for the plaintiff, they may state what they allowed plaintiff for loss of time. A. Sixty dollars."

" 31. If the jury find for the plaintiff, they may state what portion of the verdict that they find was given for money which the plaintiff lost at the time of being ejected from the train. A. Four dollars."

Subsequently the railroad company filed its motion for a new trial, which was overruled, and judgment entered upon the verdict in favor of Gants and against the railroad company. The defendant company excepted, and brings the case here.

*Geo. R. Peck, A. A. Hurd, C. N. Sterry,* and *Robert Dunlap,* for plaintiff in error.

*Ady & Henry,* for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: On May 19, 1885, A. C. Gants, a hotel clerk at Wichita, took passage on a train of the Atchison, Topeka & Santa Fé Railroad Company from Wichita to New-

ton, intending to go to Peabody. He paid his fare to the conductor on the train from Wichita to Newton. He claims he was told by the conductor of the Wichita train that he could either continue on the train or go upon one an hour later. While at Newton, he purchased a ticket over the Atchison road for Peabody, and paid for it fifty cents. He remained at Newton nearly an hour to get shaved and look around the town, and about nine o'clock he took his seat in a car of a train at the depot; this was the eastern fast train, commonly called the "cannon ball." According to the regulations of the railroad company, this train was scheduled not to stop at Peabody except for the purpose of letting off passengers who had taken passage at some point west of Newton; but when it had no such passengers it would not stop at Peabody going east, and its first stopping-place would be Florence; Peabody is a station between Newton and Florence, about four miles west of Florence; the local train which stopped at Peabody left Newton before the cannon ball. According to the evidence of the railroad company, a brakeman upon the "cannon ball" announced before the train started that "it would not stop until it got to Florence." Gants testified that just as the train started from Newton a trainman came to the car-door and said, "this train will not stop until it gets to Florence," but he claims he did not know then where Florence is. He further testified:

"*Ques.:* How long did the train which you say you boarded and saw headed toward the east, remain there? *Ans.:* I think about twenty minutes.

"Q. You had ample opportunity to get a ticket, and had ample opportunity to ask the men who were employed about that train, whether that train stopped at Peabody? A. Yes, sir, I expect I did, if I wanted to.

"Q. You made no inquiries? A. No, sir.

"Q. It is a fact, from the time you arrived on the train going from Wichita to Newton you made no inquiries as to that train, as to what time the train started, and whether it stopped at Peabody? A. No, sir.

"Q. Never made any inquiries, either of the ticket agent or any person who had apparently charge there, although the

train was standing there fifteen or twenty minutes after it got there, and while you were there?    A. I do not think I did.

"Q. How soon did you get aboard this train before it started?    A. I cannot say; probably five minutes."

Gants, however, testified that when he bought his ticket for Peabody at Newton, he was told by the agent who sold him the ticket, "to take the next train."

After the "cannon-ball" train had left Newton and gone about three miles, the conductor called upon Gants for his ticket; he presented a ticket for Peabody, and the conductor informed him that the train did not stop at Peabody, and demanded from him thirty-four cents in addition to his ticket for the fare from Peabody to Florence; Gants refused to pay the additional fare; the conductor then informed him that if he did not pay, in addition to his ticket, the fare from Peabody to Florence, he would have to stop the train and put him off; Gants replied "that he would have to put him off, as he would not pay any further;" the conductor then told him he would put him off, and stopped the train for that purpose; after the train had been stopped the conductor in a gentlemanly manner requested Gants to leave the train; he refused to get off, and dared the conductor to put him off; he resisted being put off to the utmost of his power and ability; on account of this resistance the conductor was unable himself to remove him; but with the assistance of two or three persons he succeeded in ejecting him from the train; after the train stopped, and while the conductor was attempting to ejecting Gants from the car, a severe altercation took place between them; the railroad company offered evidence tending to show that Gants during this time used vile and profane language to the conductor in the car, which contained many passengers, a number of them being ladies.

After Gants was ejected from the train he walked a portion of the way back to Newton, and then got upon a hand-car and rode to Newton, arriving there between ten and eleven o'clock in the forenoon; in the afternoon or evening of the same day, he went to Peabody from Newton upon a local train, and the

same day returned to Wichita. Upon his part, he claims that he was wrongfully ejected from the train, and was unlawfully kicked, bruised and injured in being ejected. This action was brought to recover damages therefor; verdict and judgment for Gants, for four thousand dollars. The railroad company moved for a new trial, which was refused, and it brings the case here.

The important questions presented in the record are: First, whether the railroad company had the right to eject Gants from the train; second, if the railroad company had that right, and Gants resisted to the utmost of his power and ability, whether he can recover for the injuries inflicted in his removal, unless they were willful, wanton, or malicious. The law is well settled that, in the absence of statutory provisions to the contrary, a railroad company may adopt a regulation that a certain train or trains of passenger cars running regularly on its road shall not stop at designated stations or places; and it is the duty of a person about to take passage on a railroad train to inform himself when, where and how he can go or stop, according to the regulations of the company. (*Railway Co. v. Nuzum*, 50 Ind. 141; 9 Am. & Eng. Rld. Cases, 307, 317; 3 id. 340; *Railway Co. v. Swarthout*, 67 Ind. 567; *Henry v. Railroad Co.*, 76 Mo. 288.) In this state there is no statutory provision to the contrary, and as the train upon which Gants took passage was not to stop, under the regulations of the company, until it reached Florence, the conductor had the right, after the train started, to stop the train and require Gants to leave it, if he refused to pay the fare which, in addition to the sum paid for his ticket, would have entitled him to ride to Florence. (*Fink v. Railroad Co.*, 4 Lans. [N. Y.] 147; *Railroad Co. v. Pierce*, 3 Am. & Eng. Rld. Cases, 340; *The Penn. Co. v. Hine*, 41 Ohio St. 276.) It was the duty of the railroad company to the public to run its trains according to its regulations, and it was also the duty of Gants to have informed himself whether the train stopped at Peabody. It is claimed, however, upon his part, that when

1. Regulation — stopping only at certain stations.

2. Going and stopping — passenger to know.

he purchased his ticket he was told by the agent to take the next train, and therefore that he was without fault in getting upon the "cannon ball." In his direct examination, Gants testified:

"*Ques.*: Upon your arrival at Newton, what did you do? *Ans.*: I bought a ticket and went up town.

"Q. For what purpose? A. I wanted to get shaved and look around the town a little.

"Q. How long did you remain in Newton? A. Why, I should say a little over an hour; a little over an hour, perhaps."

If he purchased his ticket immediately upon his arrival at Newton, the agent at the depot very properly told him "to take the next train," as there was evidence tending to show that a local train which stopped at Peabody left Newton for the east soon after Gants reached there. Subsequently, in his examination, Gants testified that he bought his ticket after he got shaved and had looked around the town. If this be true, and he was misinformed by the ticket agent and thereby induced to take the fast train going east, which did not stop at Peabody, this would give him a remedy against the railroad company for its breach of contract, but would not justify him in refusing to leave the train when ordered so to do by the conductor. "The business of railroads can only be carried on safely by having regularity. If trains are arranged in a certain way and their time fixed with regard to limited stoppages, a conductor would never be safe if he were bound at his peril to ascertain from any mere stranger the existence of an agreement by the company to change the arrangement and stop at an unusual place." (*Railroad Co. v. Pierce*, supra.)

Under all the evidence in the case, whether Gants was upon the train by mistake, or wrongfully, he should have paid the extra fare to Florence, when demanded, or left the train when it stopped and he was ordered to get off. If his mistake was induced by the company's ticket agent, then the fare from Peabody to Florence would be a proper element of damages, in addition to such as were occasioned by the failure to take him to Peabody on the train which he was

6. Pay fare, or get off.

told to take. If, however, he was misinformed by the local agent, but subsequently, after entering the train and before it started, was afforded such means of correct information by the announcement of the brakeman, or otherwise, as a reasonable and prudent man would not neglect, he could not thereafter rely in good faith upon the incorrect statement of the agent from whom he bought his ticket. Even if Gants made a mistake in taking the train, induced by the ticket agent, it was not necessary for him to invite force to secure his legal demands. In *Townsend v. Railroad Co.*, 56 N. Y. 295, Grover, J., said:

"No one has a right to resort to force to compel the performance of a contract made with him by another. He must avail himself of the remedies the law provides in such case."

In *Bradshaw v. Railroad Co.*, 135 Mass. 407, Allen, J., said:

"If a railroad company has agreed to furnish a passenger with a proper ticket and has failed to do so, he is not at liberty to assert and maintain by force his rights under that contract; but he is bound to yield, for the time being, to the reasonable practice and requirements of the company, and enforce his rights in a more appropriate way. It is easy to perceive that in a moment of irritation or excitement, it may be unpleasant to a passenger who has once paid to submit to an additional exaction. But unless the law holds him to do this, there arises at once a conflict of rights. His right to transportation is no greater than the right and duty of the conductor to enforce reasonable rules, and to conform to reasonable and settled customs and practices, in order to prevent the company from being defrauded; and a forcible collision might ensue. The two supposed rights are in fact inconsistent with each other. If the passenger has an absolute right to be carried, the conductor can have no right to require the production of a ticket or the payment of fare. It is more reasonable to hold that, for the time being, the passenger must bear the burden which results from his failure to have a proper ticket."

In *Railroad Company v. Connell*, 112 Ill. 295, Craig, J., said:

"We entertain no doubt that appellee was entitled to recover the amount of the cost of a ticket from the place he

was ejected from the cars, to New York. He was also entitled to recover such damages as he sustained on account of the delay occasioned by the expulsion, and all additional expense necessarily occasioned thereby, as well as reasonable damages for the indignity in being expelled from the train; but we perceive no ground upon which he can recover for personal injuries received, unless the expulsion was malicious or wanton."

In *Hall v. Railroad Co.*, 15 Fed. Rep. 61, Hammond, J., said:

"The conductor is somewhat like the master of a ship. He has police powers and disciplinary control over the train, and the quiet and comfort of the passengers and their safety are under his protection. He should be obeyed by the passengers, and the common notion that force must be invited to secure legal demands against his unlawful exactions, is in my judgment erroneous and vicious. All that a passenger need do is to express his dissent to the demand made upon him, and he need not require force to be exerted to secure his rights, certainly not to increase his damages. . . . I fully recognize the feeling of a 'free American citizen' in the face of threatened wrong or insult, but the safety of the ship forbids that he should fight with the master, and imperil the ship and lives and property she carries. Better that he should suffer the wrongs than to endanger or discomfort his fellow-passengers. The conductor of a railroad train is not altogether as supreme, perhaps, as the master of a ship; but on analogous principles, that seem to me obvious, it is, I think, the duty of a passenger to avoid resistance beyond mere dissent, and submit to his authority without more than mere protest, unless resistance is necessary to defend himself against impending personal injuries." (See also *S. K. Rly. Co. v. Rice*, ante, p. 398; *S. K. Rly. Co. v. Hinsdale*, ante, p. 507.)

7. Passenger not to invite force to increase damages.

Clearly, if Gants was a trespasser upon the train, as this case was put to the jury, then the conductor had the right to put him off, and it was his duty to go off without being forced to do so. If the conductor had the right to put him off, Gants at the same time could not have a legal right to resist, and necessarily he could not resist the conductor in the discharge of a duty and the

3. Passenger, trespasser on train, when.

exercise of a right and by that resistance acquire a right to resort to any force to overcome it. Of course we do not intend to intimate that a trespasser upon a train can be treated in a willful, wanton and malicious . manner. (*K. C. Ft. S. & G. Rld. Co. v. Kelly*, 36 Kas. 655.)

*5. Ejection; force, how to be used; liability.*

In the conclusion which we have reached regarding the right of the conductor to eject Gants from the train, even if he made a mistake in taking it, induced by the ticket agent, upon his refusal to pay the fare demanded, we do not overlook the fact that a railroad company is a public carrier, and that some of the authorities are in conflict with the doctrine herein announced. A moving train filled with passengers, including ladies and children, is not the place for a wrangle, a quarrel or a fight with the conductor. The interests of the public are to be considered in such a case, as well as the interests of a private individual. As was said in *Railroad Co. v. Connell*, supra, "It would be unwise and dangerous for the traveling public to adopt any rule which might encourage resort to violence on a train of cars." This conclusion will prevent breaches of the peace upon railroad trains instead of producing them, and at the same time will fully protect the passenger, by making the company responsible for all damages resulting from any breach of its contract. In addition to this, if a passenger has suffered in his business, or been put to expense by the delay or refusal of the railroad company to carry him as promised by its ticket agent, he would be entitled to ample damages therefor. In this connection it is well to state that where a trespasser is ejected from a train, such ejection may be at a place other than a depot, or station, provided care is taken not to expose his person to serious injury or danger; but in such an ejection the railroad company is not required to have consideration for the mere convenience of the wrongdoer. (*Lillis v. Railway Co.*, 64 Mo. 464; *McClure v. Railroad Co.*, 34 Md. 532; *Railway Co. v. Miller*, 19 Mich. 305; *O'Brien v. Railroad Co.*, 15 Gray, 20.)

*4. Trespasser, ejected from train, when.*

The trial court in its instructions to the jury treated Gants as a trespasser upon the train, after he refused to pay fare from Peabody to Florence, and to leave the train; but further instructed the jury as follows:

"8. If you find from the evidence that an unnecessary degree of force was employed, and that plaintiff was injured thereby, in that case he would be entitled to recover in this action."

"11. But in determining what is a reasonable degree of force under the circumstances of this case, you should consider the amount of resistance opposed by the plaintiff to those who were attempting to eject him, and if you find that the plaintiff suffered injuries which were the direct and necessary result of the application of force rendered necessary by his own resistance, he cannot recover for such injuries; but the use of a degree of force disproportionate to the resistance to be overcome would render the trainmen wrongdoers in turn, and would render the company liable for any injuries committed by reason thereof.

"12. I instruct you that if the plaintiff had exerted himself to the utmost in resisting the efforts of the trainmen to expel him, and that, in overcoming such resistance the trainmen used more force and violence than were necessary for the purpose, and without any intention to commit unnecessary injury, plaintiff was injured thereby, in such a case the resistance offered by the plaintiff may be considered in mitigation of damages."

"20. If, under the evidence and instructions of the court, the jury find for the plaintiff, then in estimating the plaintiff's damages, if any are proved, you have a right to take into consideration the personal injury inflicted upon him, the pain and suffering undergone by him, in consequence of his injuries, if any are proved, the loss of time occasioned thereby, the reasonable cost of medical attendance, and also the permanent loss or damage, if any is shown, arising from disability, resulting to the plaintiff from the injury in question, rendering him less capable of attending to his business than he would have been if the injury had not been received; plaintiff would also be entitled for any sum of money lost by him as a direct consequence of the wrongful acts complained of, and if they were wrongful, any money was so lost; and if you further find from the evidence that the injury complained of was inflicted wantonly or willfully, and that the plaintiff has sustained damages

thereby, then the jury are not limited in assessing the damages to mere compensation for damages actually sustained, but you may give him a further sum by way of exemplary or vindictive damages, as a protection to the plaintiff and as a salutary example."

The railroad company requested the following instruction, which was refused:

"In determining the question in this case as to whether the trainmen on the train from which plaintiff was ejected used more force or violence than was necessary to be used in ejecting plaintiff from such train, you are to take into consideration the amount of resistance offered by plaintiff to such ejection; and if you find that he resisted the attempt of the conductor to put him off from such train with all the force and power he was capable of using, then, and in such a case, you are instructed that the law will not with a nicety weigh the amount of force necessary to be used in overcoming such resistance, and that in such case the defendant would only be liable in a case of palpable and perfectly apparent use of force beyond that which was clearly necessary to be used in overcoming the resistance offered by plaintiff."

If Gants was a trespasser upon the train, the conductor had the right to eject him, and we think the railroad company can only be made responsible for the injuries inflicted which were willful, wanton, or malicious.

In refusing to give the instruction prayed for, and in giving to the jury the twelfth instruction, and also the twentieth, the court made the railroad company liable in damages for all excessive force used in overcoming the resistance of Gants, although such force was used "without any intention on the part of the conductor or those assisting him to commit injury." The first clauses of the twentieth instruction permitted Gants to recover for "the personal injuries inflicted upon him, and the suffering undergone by him in consequence of his injuries," although a part of the injuries may have been occasioned in overcoming his own unlawful resistance. In *Galbraith v. Fleming*, (Mich.) 27 N. W. Rep. 581, the court said:

"The law does not put a premium upon fighting, and one who voluntarily enters into a quarrel will not be afforded re-

lief for his own wrong in damages, if he come out second best. While the voluntary act on the part of the plaintiff would not preclude the state from punishing him or the defendant for a breach of the peace, it nevertheless prevents him from bringing a civil action to recover compensation for injuries received by his own seeking and in violation of law."

In *Taylor v. Clendening*, 4 Kas. 524, it was held that—

"Where a person who was the original aggressor in an affray, met with too vigorous a defense and sued for damages on account of the injuries, could not recover of his intended victim."

It has been decided by this court, time and again, that whenever it appears that the plaintiff's negligence or wrongful act had a material effect in producing the injury, or substantially contributed toward it, he is not entitled to recover; and further, that if a plaintiff is first in fault in infringing upon a defendant's rights, the defendant is absolved from all but slight care, and is liable only for gross or wanton negligence. (*U. P. Rly. Co. v. Rollins*, 5 Kas. 167; *K. P. Rly. Co. v. Pointer*, 14 id. 37.) In the latter case it was said by BREWER, J.:

"Many considerations, especially the difficulty of correctly apportioning the damages, and determining to what extent the wrong of the respective parties was instrumental in causing the injury, uphold the rule so universally recognized, that where the wrong, the negligence of both parties, contributes to the injury, the law will not afford any relief."

In this case, Gants could have remained upon the train and gone to Florence by paying the fare from Peabody to that station; or, when the train stopped he could have left the train when requested to do so by the conductor in a gentlemanly manner; and it is clearly evident that if he had done either, he would not have suffered any personal injuries at the hands of the conductor or trainmen. He stubbornly refused to pay the additional fare, and also forcibly resisted when requested to leave the train. He did all of this after the conductor had informed him that the train would not stop at Peabody, and that he must pay to Florence or get off. Under the rule established in this state in *Taylor v. Clendening*, so

long ago as 1868, Gants ought not to recover, even if his resistance might have been overcome with something of less force than the conductor and his assistants actually used, unless such excessive force was willful, wanton, or malicious.

By resisting to the utmost of his power and ability, Gants invited force; and he ought not to complain of the force used if there was no intention upon the part of the conductor or his assistants to commit unnecessary injury. On the other hand, if Gants, although a trespasser upon the train, received injuries which were the direct and necessary result of willful, wanton or malicious acts of the conductor, or those assisting him, he is entitled to his damages. (*K. C. Ft. S. & G. Rld. Co. v. Kelly*, supra.)

Counsel for Gants insist that the decisions are that a trespasser can recover for all injuries arising from the use of unnecessary force, without regard to whether it was willful, wanton, or malicious; and also insist that this court has recognized this rule in *M. K. & T. Rld. Co. v. Weaver*, 16 Kas. 456; and *K. P. Rly. Co. v. Kessler*, 18 id. 523. In the Weaver case, the railway company was found by the jury to have been the aggressor after the passenger had been ejected and put upon the ground. The expulsion in that case was held to have been wrongful, but as it did not seem to the court to have been wanton, or excessively cruel, the damages were deemed excessive and the judgment reversed. In the Kessler case the court held that in the wrongful expulsion of the passenger from the train, the railroad company was guilty of such gross negligence as amounted to wantonness; and yet, even then, with much hesitation it affirmed a judgment of eight hundred and twenty dollars only.

In several of the cases cited by counsel, where damages have been allowed for unnecessary force, the unnecessary force was wanton or malicious. In *McKinley v. Rld. Co.*, 44 Iowa, 314, the acts of the brakeman, for which the company was held liable, were malicious and criminal. In *Bass v. Rly. Co.*, 39 Wis. 636, the passenger peaceably and lawfully entered a ladies' car in

40 — 38 KAS.

which there were many vacant seats, and when about to occupy one was rudely and violently seized by a brakeman, aided by a volunteer, and forcibly thrust from the car. The passenger was not at first requested to leave the car, or forbidden to enter it. In that case, the assault was willful, wanton, and malicious. In *Jackson v. Rld. Co.*, 47 N. Y. 274, the passenger tendered five cents for fare on a street car and the conductor demanded six. This was refused. The conductor caught the passenger around the waist and stopped the car to put him out. The passenger refused to leave the car, and resisted; the conductor struck him a blow on his nose, but made no further attempt to eject him. The blow struck by the conductor was held by the trial court to have been willful and malicious; and the case was reversed, because it was not left to the jury to determine whether the act was done without malice or ill-feeling. In *Hanson v. Rly. Co.*, 62 Me. 84, after the passenger had ceased all resistance and was returning to his seat with his back to the brakeman, the latter struck him several blows with an iron poker, two feet long and half an inch in diameter, about the head and shoulders and over the eye. Evidently the assault of the brakeman in this case was also willful, wanton, and malicious. In *Coleman v. Rld. Co.*, 106 Mass. 160, the passenger who was ejected was struck two or three heavy blows behind the ear, and thrown bodily upon the platform of the depot. The trial court in that case instructed the jury that the railroad company was responsible for excessive or unreasonable force; but also stated to the jury that the passenger "had no right to resist the process of being put out." In the opinion in that case, it was said that—

"Violence on the part of the passenger would increase the violence necessary and proper to be used on the part of the employés; and if it contributed in any degree to the violence of his fall, or to the aggravation of his disease, he cannot recover for the injuries he received. The burden was on him to prove that his own illegal acts did not in any degree contribute to the alleged injury, but that it was wholly caused by the wrongful acts of the railroad company's servants."

This language plainly implies that the unnecessary force must be wanton or malicious.

We think a critical examination of the decisions will demonstrate the general rule to be that where parties are permitted to recover solely on account of injuries inflicted by unnecessary force, or excessive violence, the facts in the cases disclose that the force or violence used was willful, wanton, or malicious; and that in most of the cases "unnecessary force" or "excessive violence" was used as synonymous or tantamount to wanton or malicious force.

But counsel insist that the excessive force used in this case was willful and wanton; and therefore that the judgment should not be disturbed. We cannot assent to this. Under the instructions the jury were not authorized to separate the force used in overcoming obstinate and forcible resistance with no intention to commit injury, from the force that was used willfully, wantonly, or maliciously, if any such force was used. Even if Gants was upon the train under the direction of the ticket agent and without fault on his part, as before remarked he should have paid the extra fare to Florence, as he was able to do, or left the train when it stopped. For the mistake of the ticket agent, or the wrong of the railroad company, if any, he had ample remedy. (*S. K. Rly. Co. v. Rice*, supra; *Mfg. Co. v. Boyce*, 36 Kas. 350.)

As a new trial must be ordered, we will dispose of the minor alleged errors: There was evidence on the part of the railroad company that prior to his removal from the train, Gants used vile, obscene and profane language. Gants introduced two witnesses to show that he was not in the habit of using obscene or profane language. One of the witnesses testified that he had known Gants over a year, and that he never heard him "use half a dozen oaths in his life." Another witness testified that he never heard him "use obscene language in public, but that he might have heard him make use of an oath sometimes, but not frequently." We do not think the answers of the witnesses very material, or as tending to prove much.

Whether Gants had a great propensity to use obscene language,

8. Profane language—incompetent evidence.

is not important.    If such evidence were permitted, it would present a collateral issue, and we do not think, under the authorities, that this evidence in this kind of a case is competent. (*Thompson v. Bowie*, 4 Wall. 463; *Commonwealth v. Kennon*, 130 Mass. 39.)

Also, the question permitted to be asked upon cross-examination of one of the witnesses as to the number of saloons in Las Animas and La Junta, Colorado, was wholly improper, because it did not tend to rebut, impeach, modify or explain any of his testimony.

Again, we do not think that the evidence of what the conductor of the Wichita train told Gants was admissible.    If it were true, it was not sufficient ground for Gants to refuse to pay his fare to Florence, or to resist removal from the train.

9. Conductor represents company as to his own route.

A conductor in the line of his duty in collecting fare, taking up tickets and in giving information to the passengers on his train, represents the company as to the running and operation of his own train, but in this case the Wichita train stopped at Newton, and Gants had to change cars at that place in order to go to Peabody.    In the case of *Railroad Co. v. Gilbert*, 22 Am. & Eng. Rld. Cases, 405, cited, the conductor instructed the passenger to keep her seat upon his train, although she had a ticket for a train that branched off in another direction.    The court there very properly held that the answer of the conductor was equivalent to saying she was on the right train; and held the railroad company responsible in damages, but did not intimate that she could have increased her damages by refusing to leave the train when ordered. (See *Railroad Co. v. Carper*, 14 N. E. Rep. 352; 13 id. 122.)    There was some evidence tending to show that Gants was removed from the train with the assistance of one or two passengers; and it is claimed on the part of the railroad company that the company is not responsible for their acts, unless they were requested by the conductor to assist.    It was not necessary that the conductor should have

10. Ejection — wanton and malicious force used — liability.

given express directions to all concerned in the ejection, but if any passenger aided the conductor, or the trainmen, with his permission and sanction, a jury might infer an employment. If, on the other hand, the passengers were mere interlopers, and the conductor had no opportunity to interfere with their actions, it would not be fair that the railroad company should be held responsible for their acts.

The judgment of the district court will be reversed, and the cause remanded for a new trial.

All the Justices concurring.