THE SOUTHERN KANSAS RAILWAY COMPANY v. A. M. HINSDALE.

1. FREIGHT TRAIN; *Tickets, Rule Requiring; Facilities for Buying.* A railway company has the power to make and enforce a rule or regulation requiring persons desiring to ride upon its freight trains to provide themselves with tickets; but in all such cases the company must furnish convenient facilities to the public for the purchase of tickets, by keeping open the ticket office a reasonable time in advance of the hour fixed by its time table for the departure of the trains.

2. TICKETS, *Time to Procure; Expulsion of Passenger.* If the conductor or brakeman of a freight train repairs to the caboose of the train after all the passengers are aboard, and announces loud enough for all the passengers to hear, that it is necessary for all persons who desire to ride upon the train to procure tickets before the train starts, and ample time and opportunity are given thereafter for persons to procure tickets, then sufficient publicity is given to the passengers upon the train of the rule of the company; and the right of expulsion for non-compliance with this regulation by a person may be exercised after leaving the station, at any suitable place.

3. PASSENGER, *Should Leave Train, When.* Where a person takes passage upon a freight train of a railway company without first procuring a ticket, as required by a rule of the company, to entitle him to ride upon that kind of a train; and the conductor has no right to accept any fare, or money, the conductor may require such person to leave the train. In such a case, after the train is stopped and the person is notified by the conductor to get off, he should leave.

4. ABUSIVE LANGUAGE *by Conductor in Ejecting Passenger; Damages; Practice.* Where a conductor, in ejecting a person from a railroad train, uses insulting or abusive language in ejecting him, such person may recover damages therefor, on account of the injury to his feelings; but he cannot, in an action for damages for his expulsion, also recover damages because the words used by the conductor tended to bring him into ignominy or disgrace.

*Error from Allen District Court.*

THIS case was tried by a jury, at the January Term, 1886, of the district court of Allen county. There was a verdict and judgment for the defendant in error for $525. Special

questions of fact were submitted to the jury, and answers returned, as follows:

"1. Did the defendant, at the time of the injuries complained of in plaintiff's petition, have any regulations for the government and management of its freight trains whereby passengers could not be carried upon such trains without tickets, passes, or stock contracts?  *Ans.:* Not to knowledge of plaintiff.

"2. Did the brakeman in charge upon the train from which the plaintiff was removed, inform the plaintiff before the train left the depot at Iola that a ticket would be necessary before anyone could ride upon that train?  A. No.

"3. Did the conductor, T. J. Brown, announce in the presence and hearing of the plaintiff, and before the train left Iola, and in a manner loud enough and distinct enough for the plaintiff to have understood him, that it was necessary to have tickets before passengers could ride upon that train, or other words to that effect?  A. No.

"4. Did the plaintiff do anything to ascertain what regulations, if any, existed, for the carrying of passengers upon the freight trains of the defendant?  A. No.

"5. If you should answer the last above question in the affirmative, then state what he did in that respect.  A. ——.

"6. Was the plaintiff informed by any person before the train left the station at Iola, that the defendant required persons who rode upon its freight trains to have tickets therefor?  A. No.

"7. Would the plaintiff by the use of ordinary care and caution have known before the train left the depot at Iola, that the regulations and rules of the defendant required that passengers should not be carried upon freight trains without tickets, passes, or stock contracts?  A. No.

"8. Did the plaintiff so conceal himself upon the train that the conductor did not discover him until within a few rods of the place where he was removed from the train?  A. No.

"9. What, if any, was the real object of the plaintiff in getting on top of the caboose of the train from which he was removed?  A. Nothing.

"10. What distance did the plaintiff ride before he was removed from the train?  A. One and three-fourths miles.

"11. Did the plaintiff consent to the use of all of the force that was employed by the conductor in removing him from the train?  A. No.

"12. Did the conductor, T. J. Brown, attempt to remove

or offer to remove the plaintiff from the train until after the plaintiff had invited him to take hold of him and put him off the train? A. Yes.

"13. Was the removal of the plaintiff from the train accompanied by the use of any abusive, profane or scurrilous language on the part of the conductor, T. J. Brown? A. Yes.

"14. If you should answer the preceding question in the affirmative, then state fully what the language used by said Brown was. A. Beat and bummer.

"15. Did the conductor use any more force than was necessary to remove the plaintiff from the train? A. No.

"16. Did the conductor, in removing the plaintiff from the train, exercise any force against the plaintiff that was prompted by malice, hatred, passion, or any other improper motive or feeling? A. To some extent.

"17. Were the plaintiff's feelings wounded or injured by any words used by the conductor, T. J. Brown? A. Yes.

"18. If you should answer the foregoing question in the affirmative, state the words that wounded or injured his feelings, and the amount of general damages you award the plaintiff, by reason of the use of the words. A. Bummer and beat—$400.

"19. Did any of the words spoken by the conductor toward the plaintiff at the time of the injury complained of, tend to bring the plaintiff into ignominy or disgrace? A. Yes.

"20. If you should answer the foregoing question in the affirmative, then state the words that were spoken, and the amount of general damages you award the plaintiff on account thereof? A. Bummer and beat—$125.

"21. Did the conductor by any act of his own injure the plaintiff? A. Yes.

"22. If you should answer the foregoing question in the affirmative, then describe the act that injured the plaintiff? A. Skinned his leg and sprained his ankle.

"23. Was the plaintiff injured in his person at the time of the removal of himself by the conductor from the train? A. Yes.

"24. If you should answer the foregoing question in the affirmative, then state whether such injury was the result of any act of T. J. Brown, or the result of his own carelessness or negligence, or the result of accident alone. A. Act of T. J. Brown.

"25. What were the general damages done to the person of the plaintiff at the time of the injuries complained of in

his petition, that resulted from any act of the conductor, T. J. Brown?    A. Mental and physical.

"26. What, if any, were the general damages done to the feelings of the plaintiff by reason of any sufferings that were the result of any physical injuries received at the time of the injuries complained of, and that were the result of any act of T. J. Brown?    A. Mental and physical.

"27. Where was the plaintiff when the conductor took up the passes of the other passengers?    A. On the caboose.

"28. Where was the plaintiff when the train stopped north of Iola?    A. In the caboose.

"29. How far did the train go after leaving the depot before it stopped at the place where plaintiff was removed from it?    A. One and three-fourths miles.

"30. How long did the train remain at the place where it stopped, before the plaintiff was removed from it?    A. Twenty minutes."

The defendant *Railway Company* brings the case to this court.

*Geo. R. Peck, A. A. Hurd,* and *Robert Dunlap,* for plaintiff in error.

*Knight & Foust,* for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: A. M. Hinsdale brought his action against the Southern Kansas Railway Company, to recover damages for being wrongfully ejected from a freight train.   On March 27, 1885, being in the city of Fort Scott and having business to transact that day at Garnett, as a special agent of the Orient Insurance Company, he went over the Fort Scott road in the morning to Iola, and then proceeded to the depot of the Southern Kansas road, where he got aboard the caboose about three-and-a-half o'clock in the afternoon, intending to go to Garnett; he had with him his overcoat and valise; he deposited his overcoat and valise in a seat in the caboose and took a seat near the stove, where he remained a few minutes; then, with another passenger he went up into the cupola of the caboose and stayed until after the brakeman came on the train;

and after the train had started and had gone about a quarter of a mile, he suggested to the party with him in the cupola that they go outside, and both of them did, but as it was windy, the party with him went back into the caboose in a few minutes; soon after, it commenced to rain, and he turned to go down into the caboose, when the conductor put his head out of the window and asked him for his ticket; he handed the conductor a silver dollar, but the conductor told him he could not carry him without a ticket, and refused to accept the money; the conductor then told him he must get off, and stopped the train; the train remained standing twenty-five minutes for Hinsdale to get off; Hinsdale told him he did not "get on to get off between stations," and said "he would not get off until he was put off;" the conductor then put him off at the place where he had stopped the train, a distance of one and three-quarters miles from the depot at Iola, but in removing him from the train did not use any more force than was necessary. Upon the trial, a verdict and judgment were rendered for Hinsdale for five hundred and twenty-five dollars.

This is another one of the class of cases in which the real struggle is with the findings of fact as returned by the jury. Some of the answers to the special questions submitted are not only against the current of testimony, but the entire evidence. Other answers are not frank, but evasive, and several are not responsive to the questions asked. (*U. P. Rly. Co. v. Fray*, 31 Kas. 739.) The jury specially found that Hinsdale did not do anything to ascertain what regulations, if any, existed for the carrying of passengers upon the freight trains of the railway company. The evidence shows that the company had a rule or regulation forbidding the conductors of its freight trains to carry on such trains any passenger who had not a ticket, a pass, or a stock contract. It is the duty of a passenger to inform himself of the regulations governing the transit and conduct of the trains, if such rules are reasonable. If a passenger disregards the regulations adopted by a company as to the purchase of tickets, or the running of trains, by failure upon his part to make any inquiries, and such neglect is not

induced by the company's agent having authority in the matter, the company is not liable therefor. (21 Cent. L. J. 253; *Rly. Co. v. Nuzum*, 50 Ind. 141; *Beaucamp v. I. & G. N. Rly. Co.*, 56 Tex. 239; *Logan v. St. L. K. C. & N. R. Rld. Co.*, 76 Mo. 288.) A railway company has the clear right to make a rule that no one shall be carried as a passenger on its freight trains without tickets, passes, or stock contracts; but in all such cases the company must furnish convenient facilities to the public for the purchase of tickets, by keeping open the ticket office a reasonable time in advance of the hour fixed by its time table for the departure of the trains. (*Rld. Co. v. Rose*, [Neb.] 8 N.W. Rep. 213; *Rld. Co. v. Nelson*, 59 Ill. 110; *Rld. Co. v. Bartram*, 11 Ohio St. 457; Thompson on Carriers, 377.) In this case the ticket office was open, and the agent at the depot was selling tickets for the train. Hinsdale had ample time and opportunity before the train started upon which he attempted to take passage, to have ascertained that it was necessary for him to purchase a ticket in order to ride.

1. Freight train; tickets, rule requiring; facilities for buying.

The conductor testified that after Hinsdale got upon the train and before it started, he went into the caboose and asked "if all the gentlemen had tickets;" there was one person in the car who said that "he did not have any ticket," and the conductor then "told him it was a necessary article to have to ride upon the train;" after that, the train remained at the station for from twenty to thirty minutes; the party who said he was without a ticket subsequently went and got a ticket, and rode upon the train. One of the brakemen testified that Hinsdale and another passenger were up in the cupola of the caboose before the train started, and that he said loud enough for them to hear, "All must have tickets to ride upon this train." This was also corroborated by the evidence of another employé. Upon this matter Hinsdale testified:

"*Ques.:* Didn't you hear the brakeman make a statement that no passenger could ride upon that train without first getting a ticket, or in substance that? *Ans.:* I don't know that I did.

"Q. Do you know that you did not? A. I have no knowledge.

"Q. Do you swear you did not? A. I did not, to the best of my knowledge and belief.

"Q. You don't pretend to say that he did not say it? A. I do not.

"Q. And in your presence? A. Possibly he might have done so.

"Q. And within three feet of where you stood? A. I wouldn't hear all he said ——

"Q. Do you pretend to deny that the conductor informed the passengers present that they must procure tickets? A. No, sir; I don't deny that, but I did not hear him.

"Q. Did you hear any remark about tickets at all? A. I am satisfied I heard no remark about tickets; if I did, it entirely slipped my memory."

The jury specially found that Hinsdale had no knowledge that it was necessary for passengers to have tickets to be carried upon freight trains. If Hinsdale was prevented from hearing the announcements of the conductor and brakeman, on account of being in the cupola of the caboose, a place intended only for trainmen, then his want of knowledge was the result of his own fault or conduct. If the conductor or brakeman, or both, went into the caboose after all the passengers were aboard, and announced, loud enough for all the passengers to hear, that it was necessary for all persons who desired to ride upon that train to procure tickets before it started, and in ample time for all wishing to ride to procure tickets, then sufficient publicity was given to the rule of the company; and reasonable facilities having been afforded for compliance therewith, any passenger neglecting so to do might be ejected from the car in a proper place and manner. In the absence of a statute regulating this matter, there is no requirement at common law to eject any person who shall fail to comply with such a reasonable regulation at one place rather than another. The convenience of the party is not to be consulted, but the law never permits one to wantonly expose another to injury;

2. Tickets, time to procure; expulsion of passenger.

33 — 38 KAS.

therefore no one should be ejected while the car is in motion, so as to endanger his life, limb, or person.

Several witnesses testified that they did not hear the announcements of either the conductor or brakeman concerning the necessity for the purchase of tickets. Such evidence, being of a negative character, is not estimated so highly as testimony of one who swears positively that a statement was made, or something done. (*K. C. Ft. S. & G. Rld. Co. v. Lane*, 33 Kas. 702.) In any event, if the failure to hear the announcements on the part of Hinsdale was his own fault, either on account of being in the cupola or engaged in telling a story to a fellow-passenger, the company was not negligent in giving publicity to its regulations concerning the purchase of tickets for that train; and this view of the case seems to have been wholly disregarded by the jury in their findings. The jury found specially that the plaintiff, in the use of ordinary care and caution, could not have ascertained that he was required to purchase a ticket before being carried upon a freight train. This finding is without any evidence for its support, and is also against the positive evidence of the conductor and brakeman. If Hinsdale had applied at the company's office for a ticket, and found it closed, or if he had made inquiries of the conductor or brakeman and got no answer, or if he had been induced by the ticket agent or conductor to take the train without the purchase of a ticket, he would have been excusable for being upon the train without a ticket. None of these things occurred. After the train stopped and he was notified by the conductor to leave, he should have submitted for the time being. The fact that he caused himself to be ejected from the car, can add nothing to his cause of action. A party will be entitled to as much damage for any wrong or injury quietly endured as if he violently resisted. (*Rld. Co. v. Griffin*, 68 Ill. 499; *Rld. Co. v. Connell*, 112 id. 295. See also *S. K. Rly. Co. v. Rice*, ante, p. 398.) Where a party

3. Passenger should leave train, when.

upon a train is explicitly informed by the conductor that he cannot retain his seat and must leave the car, he then knows that he cannot proceed longer upon the

train, but must leave, and resort to his legal remedy the same as though he had been ejected.

"If, after this notice, he waits for application of force to remove him, he does so in his own wrong; he invites the use of the force necessary to remove him, and if no more is applied than is necessary to effect the object, he can neither recover against the conductor nor company therefor. This is the rule deducible from the analogies of the law." ( *Townsend v. Rld. Co.*, 56 N. Y. 295; *Hall v. Rld. Co.*, 15 Fed. Rep. 57.)

It is contended on the part of Hinsdale that he was properly in the caboose without a ticket, because the railway company had not published in the station house, or caboose, the regulation requiring passengers to provide themselves with tickets before entering the car of a freight train; and also that it was usual for the company to carry passengers on its freight trains without tickets, notwithstanding the existence of the rule to the contrary. If the railway company gave the actual notice of the regulation in the caboose, as testified to by the conductor and brakeman, then actual notice was brought home to the passengers before the train left the station; and the alleged excuses for Hinsdale's continuance on the train without a ticket will not avail. If Hinsdale had used this train often, before and after the adoption of the rule as to the purchase of tickets before entering the caboose of a freight train, without objection for want of a ticket, then of course he would be excusable for not having provided himself with a ticket, if no announcement was made by the conductor or brakeman, as testified to. (*Railway Co. v. Greenwood*, 79 Pa. St. 373.) But a single instance of fare having been accepted by a conductor in violation of this rule would not justify a person in disregarding the same, if previous notice thereof had been given by posters in the station house.

Four hundred dollars of the judgment seems to have been given for the use of the words "bummer" and "beat" by the conductor, as damages for injury to Hinsdale's feelings; and one hundred and twenty-five dollars for injury for the use of the words "bummer" and "beat," by the conductor to Hinsdale, on account of bringing him into ignominy or dis-

grace. This is not an action for slander or libel; and the jury attempted to aggravate the damages for the use of the words "bummer" and "beat." Even if Hinsdale was rightfully expelled from the train, the conductor had no right to treat him in a malicious or insulting manner; but if it be admitted

4. Abusive language by conductor in ejecting passenger; damages; practice.

that the conductor used the language alleged by Hinsdale, while he might recover on account of the words for injury to his feelings, he cannot, in an action of this kind and upon the pleadings filed in this case, also recover damages because the words tended to bring him into ignominy or disgrace. As we read the record, however, it is very doubtful whether the conductor used any severer language to Hinsdale than that "if he was not trying to beat his way and was a gentleman, he would get off."

The judgment of the district court will be reversed, and the cause remanded for a new trial.

All the Justices concurring.