No. 18,606.

FRED SCHMIDT, *Appellee*, v. THE KANSAS CITY WESTERN RAILWAY COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

PERSONAL INJURIES—*Ejected from Street Car—Wantonly Injured.* While a passenger upon a railroad should, upon the request of the conductor, pay fare or leave the train and make no forcible resistance, although he has already paid his fare, yet if he does resist, and in ejecting him he is wantonly injured by the company's employees, acting in the scope of their employment, the company is liable.

Appeal from Leavenworth district court; JAMES H. WENDORFF, judge. Opinion filed February 7, 1914. Affirmed.

*C. F. Hutchings*, of Kansas City, Mo., and *J. McCabe Moore*, of Kansas City, for the appellant.

*Lee Bond*, and *M. N. McNaughton*, both of Leavenworth, for the appellee.

The opinion of the court was delivered by

BENSON, J.: This action was brought by a passenger upon the defendant's railway to recover damages for personal injuries suffered through the alleged wanton conduct of its conductor and motorman in ejecting him from a car.

The plaintiff, a paper hanger, fifty-three years of age, entered the car about ten o'clock in the evening, at a street intersection in Kansas City, to go to his home at Northwest crossing. At Welborn, while being ejected from the car, he was injured upon his head, back and shoulders by colliding with the street pavement. Evidence on his part tended to prove facts as follows: The conductor took from his book of commutation tickets a ticket good for a continuous ride to Northwest crossing. After changing cars at Chelsea Park, the conductor of the car to which the change was made called for his fare and was informed that his ticket had been taken up on the first car. The conductor insisted that another ticket should be given up or fare paid, but the plaintiff declined to do so. After some parleying the conductor passed on, making collection from other passengers, and then returned to the plaintiff and again demanded a ticket or fare. The plaintiff still refused. The car was stopped at Welborn, and the conductor then called to his assistance the motorman, who seized the plaintiff by the collar to eject him. He resisted removal by holding to the back of the seat in front of him as best he could while holding some parcels under each arm, and protesting that he should not be put off, because he had paid his fare. The motorman, however, forcibly took him to the platform at the rear of the car, kicked and pushed or threw him violently to the ground. His head and shoulders struck the pavement, causing severe injuries. He was left unconscious, lying in the roadway, while the car moved on a short distance. Upon an exclamation of a

passenger that the man had been killed, the conductor stopped the car, and with the motorman went back and pulled the plaintiff, then lying near the track, to the roadside and left him there, apparently still unconscious. They then returned to the car, which moved on. Sometime afterwards the plaintiff's son came with a wagon and took him home.

On the other hand, evidence was given tending to show that the plaintiff was intoxicated; that the first conductor did not take up his ticket, and when the payment of fare or a ticket was demanded he became abusive, and when the motorman was called used vile and profane language, created a disturbance, and fought the motorman; that the employees used no unnecessary force, and ejected him only after he had repeatedly refused to give up a ticket or pay fare or leave the car, and that when forced out to the platform he suddenly broke loose from the hold of the motorman, who was about to lead him down the steps, and this caused him to fall to the ground.

The material facts found by the jury in answering special questions are:

"About how frequently had he been in the habit of riding on said cars between said points during the time stated above? Ans. About 3 to 5 days per week.

"Did the plaintiff have a commutation ticket book containing tickets entitling him to ride from Kansas City, Kansas, to N. W. Crossing? Ans. Yes.

"Did the plaintiff still have this commutation book with tickets in it, when he boarded the second car? Ans. Yes.

"When the conductor on the second car reached the plaintiff did he ask him to let him see his commutation book? Ans. He asked for ticket.

"Did the plaintiff refuse to let him see it? Ans. Yes, he said he had paid his fare.

"Was the plaintiff under the influence of intoxicating liquor at that time? Ans. Slightly intoxicated.

"Did he use profane language to the conductor? Ans. He used the word 'Damn.'

Schmidt v. Street Railway Co.

"Did the conductor tell the plaintiff that he would either have to pay his fare or get off said car? Ans. Yes.

. . . . . . . . . .

"Did the motorman assist the conductor in putting the plaintiff off said car? Ans. Yes.

"Did the conductor call for the assistance of the motorman? Ans. Yes.

"Did the plaintiff resist both the conductor and motorman? Ans. He held onto seat."

The jury were instructed that:

"The plaintiff had no right to insist on riding on the car of the defendant company . . . without giving him the proper ticket or producing evidence that he had paid his fare, or without paying his fare, in violation of the regulations of the company; he had no right to resort to force to compel the performance of the contract, and when he failed and refused at the request of the conductor to either give his ticket or pay his fare to the conductor or produce some evidence in accordance with the regulations of the company that he had paid his fare, he should have gotten off the car when ordered by the conductor to do so; and he had no right to invite force in his rejection or removal, by refusing to leave the car when so ordered by the conductor, merely to make a case against the company, or to increase his damages."

The court also instructed the jury that if the plaintiff so refused to pay fare, or produce evidence of previous payment, and refused to leave the car, stopped for that purpose, when he was told to get off, that he then became a trespasser and the conductor or motorman had the right to eject him, "but in so doing they should not use unnecessary force or excessive violence; if, however, you. believe the plaintiff forcibly resisted being put off the car, he can not recover for the force used in overcoming his resistance, where such force is without intention on the part of the conductor or motorman, or both, to commit unnecessary injury. In such case the defendant is only liable for such unnecessary

force or excessive violence as is willful, wanton or malicious."

It is not disputed that the plaintiff was in the wrong in refusing to pay fare and in resisting removal from the car. The rule, as stated in the instructions, that a passenger should in such a situation pay the fare demanded or leave the train when ordered to do so, when stopped at a suitable place for that purpose, is not questioned by the plaintiff. (*A. T. & S. F. Rld. Co. v. Gants,* 38 Kan. 608, 17 Pac. 54; *A. T. & S. F. Rld. Co. v. Hogue,* 50 Kan. 40, 31 Pac. 698; *Chase v. Railway Co.,* 70 Kan. 546, 79 Pac. 153; *Mosher v. St. Louis &c. Railroad Co.,* 127 U. S. 390; Hale on Bailments & Carriers, § 109; Hutchinson on Carriers, § 580.)

The plaintiff rests the recovery upon the principle that although he was in the wrong or even a trespasser after refusing to pay fare, still the company had no right to inflict wanton injuries in ejecting him. In *Railroad Co. v. Day,* 68 Kan. 726, 75 Pac. 1021, the rule, supported by citations of other decisions of this court, is stated as follows:

"The rule of liability in such cases is, that a railroad company is liable in ejecting trespassers from its trains when in doing so it is guilty of wilful or malicious acts amounting to wanton negligence." (p. 730.)

The charge of wanton and willful injury was made in the petition, that issue was plainly submitted in the instructions, and was determined by the jury, by the general verdict, in favor of the plaintiff upon competent evidence.

Several errors are alleged. An objection was made to an affidavit read in evidence which had been taken and filed pursuant to section 350 of the civil code, but nothing substantial appears in the objection.

Error is alleged in the order overruling a demurrer to the plaintiff's evidence and in denying a request for an instruction to find for the defendant, based upon the contention that there was no evidence of wantonness

Schmidt v. Street Railway Co.

on the part of the company's employees. Little comment is necessary. Granting that the plaintiff was as intoxicated and behaved as badly as claimed, still it may not have been necessary to throw him from the car upon the pavement and leave him injured and unconscious by the roadside. Yet the evidence tended to prove that this was done. True there was evidence tending to prove that he was not thrown off, but fell in consequence of his own wrongful struggle and resistance, and that no unnecessary force was used, or wanton violence done in ejecting him. Upon this conflict in evidence it was for the jury to determine what the facts were and whether wanton or malicious injuries were inflicted.

The instructions are criticised on the ground that taken as a whole they required of the defendant a degree of care impracticable in the circumstances, and did not properly state the effect of the unlawful conduct of the plaintiff. One of the instructions informed the jury that when the plaintiff entered the car he became a passenger and the company owed him the highest degree of care in protecting him from violence or injury, but in immediate connection they were also told that upon his failure to pay fare or surrender another ticket when demanded the employees of the company had a right to eject him. The statement of his rights as a passenger were qualified by a declaration of the right of the company to eject him upon his failure to observe a passenger's duty. The suggestion that the jury might have understood that the highest degree of care implied a duty to call the sheriff to remove the passenger is not persuasive, for the jury were repeatedly told that the conductor and motorman had the right to put the plaintiff off on his refusal to pay fare.

Another instruction defined at length the duty of railroad companies to protect passengers from violence and insult, and to employ competent and sober men.

This was objected to as being outside the issues. As there was no evidence of incompetency or misconduct of employees except in ejecting the plaintiff, this instruction might well have been omitted. In view of the careful manner, however, in which the real issue was presented, no prejudice could have resulted from it. As already shown, the jury were told that if unnecessary force was used in pulling the plaintiff off the car, still the company was not liable if it was done without intent to commit unnecessary injury.

Other objections to the instructions have been carefully considered, but they appear to be unfounded. While they are lengthy, the real issue, whether the injuries were inflicted wantonly or maliciously, was clearly presented, and we believe was fully understood and decided by the jury.

It is insisted that passion and prejudice of the jury is shown in the allowance of $500 exemplary damages. As the right to exemplary damages was based upon the wanton conduct of the employees, already discussed, and the amount does not necessarily indicate any improper motive, this objection can not be sustained.

The following cases, among others, decide principles supporting the recovery in this action: *K. P. Rly. Co. v. Kessler,* 18 Kan. 523; *K. C. Ft. S. & G. Rld. Co. v. Kelly,* 36 Kan. 655, 14 Pac. 172; *U. P. Rly. Co. v. Mitchell,* 56 Kan. 324, 43 Pac. 244; *Railroad Co. v. Little,* 66 Kan. 378, 71 Pac. 820; *Railway Co. v. Wade,* 73 Kan. 359, 85 Pac. 415; *Harbert v. Street Railway Co.,* post; *Podespik v. Worcester Consol. St. Ry. Co.,* [Mass.] 103 N. E. 638.

The judgment will be affirmed.

PORTER, J. (dissenting) : I am unable to agree to an affirmance of the judgment in this case. It is true the jury answered "No" to the question: "Was considerable force required in removing the plaintiff from said car?" This is in direct conflict with the evidence of

plaintiff's witnesses, one of whom testified that he took hold of everything he could get his hands on, and held on, and the evidence conclusively shows that he persisted in his resistance until he was forcibly put off the car, and that it required the combined efforts of both the conductor and motorman to remove him.   Other answers of the jury are evasive and show that they regarded his excuse that he had already paid his fare as sufficient to absolve him from the plea of contributory negligence and as a justification for forcibly resisting his removal.   That such is not the law is well settled by numerous authorities which might be cited.   In *S. K. Rly. Co. v. Hinsdale,* 38 Kan. 507, 16 Pac. 937, it was said in the opinion:

"After the train stopped and he was notified by the conductor to leave, he should have submitted for the time being.   The fact that he caused himself to be ejected from the car, can add nothing to his cause of action.   A party will be entitled to as much damage for any wrong or injury quietly endured as if he violently resisted. . . . Where a party upon a train is explicitly informed by the conductor that he can not retain his seat and must leave the car, he then knows that he can not proceed longer upon the train, but must leave, and resort to his legal remedy the same as though he had been ejected." (p. 514.)

The evidence not only tends to show that plaintiff was intoxicated, but conclusively shows that fact.   He admits that he went to Kansas City, Mo., that evening for the purpose of drinking beer, and that he remained with friends near the state line from six o'clock until about eleven, and that he was drinking beer during that time on an empty stomach.   When the plaintiff's son came with a wagon to take him home, he found the plaintiff sitting in the station at Welborn.   No physician was called to treat the plaintiff for his injuries; but about a week after the occurrence he visited a physician, in company with two of his attorneys, and was examined with a view of laying

a foundation for an action for damages. The jury say they do not know how much time he lost from his work after being injured, but they allow him $250 for the loss of time, $250 for loss of earning capacity, $1000 for his injuries, and in addition $500 for exemplary damages. In my opinion, there is no evidence to sustain a finding of exemplary damages, nor do I believe that there is such a showing of excessive force as to warrant any judgment in plaintiff's favor. I would reverse the judgment and order a new trial, on the ground of manifest prejudice and passion of the jury as shown by their findings.